IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
March 28, 2001 Session

## CITY OF KNOXVILLE, ET AL. v. ROBERT J. TAYLOR, ET AL.

**Appeal from the Chancery Court for Knox County**
**No. 139330-3     Sharon Bell, Chancellor**

**FILED MAY 24, 2001**

**No. E2000-02329-COA-R3-CV**

This is an appeal from a judgment entered in the Chancery Court for Knox County imposing certain punishment as to two members of the Knoxville Police Force, Officer Robert J. Taylor and his father, Sergeant Dick Taylor. The Administrative Hearing Officer at the initial hearing found no misconduct on the part of the Taylors which would justify any penalty. The Taylors appeal contending the Chancellor was in error and there was substantial and material evidence to support the Hearing Officer's determination. As to Sergeant Taylor we reverse the Chancellor's determination and as to Officer Taylor we affirm.

**Tenn.R.App.P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed in Part;**
**Affirmed in Part and Remand**

HOUSTON M. GODDARD, P.J., delivered the opinion of the court, in which HERSCHEL P. FRANKS and D. MICHAEL SWINEY, JJ., joined.

Douglas A. Trant, Knoxville, Tennessee, for the Appellants, Robert J. Taylor and Dick I. Taylor

Ronald E. Mills, Senior City Attorney, Knoxville, Tennessee, for the Appellee, City of Knoxville

### OPINION

These cases before us, which were consolidated, had their genesis in the service of a domestic violence arrest warrant which resulted in injury to the party arrested.

After an internal investigation by the Knoxville Police Department, both Sergeant Dick I. Taylor and his son, Officer Robert J. Taylor, were terminated on February 2, 1998.

Both Taylors appealed their dismissal and, after hearing proof for a number of days, the Administrative Hearing Officer overturned their termination and found that they were "entitled to be reinstated to full rank at the time of their dismissal with back pay."

The City then filed a petition for a writ of certiorari in the Chancery Court for Knox County and the Chancellor, after a review of the transcript from the initial hearing--although not specifying in what particulars--found that the Taylors "knowingly failed to meet the obligation imposed on them by the Knoxville Police Department."

She thereupon set aside the order entered by the Hearing Officer and then ordered the following:

> [T]he Court hereby sets aside the decision of the Hearing Officer to reinstate the Appellees with back pay and no disciplinary action, and instead orders reinstatement with full back pay to Officer Robert Taylor along with a documented oral reprimand for his misconduct, dated as of the date of the original disciplinary action, to be administered in accordance with the procedures set forth by the Knoxville Police Department.
>
> The Court further orders the reinstatement with back pay of Sgt. Dick Taylor for all but thirty (30) days, and that Sgt. Taylor be suspended for thirty (30) days without pay and reprimanded for his misconduct. While the Court orally ruled that Sgt. Taylor be given credit for his time off work between termination and reinstatement, and forfeiting thirty (30) days pay, upon agreement of the parties Sgt. Taylor shall begin serving his suspension on August 19, 2000, and said suspension shall not be stayed pending any appeal. The reprimand shall be dated as of the date of the original disciplinary action.

Both Defendants appeal raising two issues:

> 1.   Whether the Chancery Court correctly applied the standard of review on a Petition for Certiorari in reaching its conclusion that the Civil Service Merit Board's Hearing Officer abused her discretion in finding that the Petitioner failed to establish that the Respondents should be subjected to termination or any other disciplinary action by the Knoxville Police Department?
>
> 2.   Whether substantial and material evidence supports the decision of the Civil Service Merit Board's Hearing Officer in ordering that the Respondents be reinstated to full rank together with back pay without any disciplinary action?

The Administrative Hearing Officer accurately detailed the facts necessary for disposition of this appeal:

Mr. Phil E. Keith acting in his capacity as Chief of Police for the City of Knoxville terminated the employment of Sergeant Dick I. Taylor and his son, Robert J. Taylor as Knoxville police officers on February 2, 1998 for various departmental code of conduct violations. The specific code of conduct violations are cited in detail in the Taylors' Statements of Disciplinary Action, but involve allegations of untruthfulness and neglect of duty which the City maintains occurred in connection with the arrest of Jack Longmire on December 14, 1997 and subsequent Internal Affairs investigation. Upon joint motion, the cases of Dick and Robert Taylor were consolidated and their terminations appealed for hearing in accordance with Articles 27 and 28 of the Rules and Regulations of the Civil Service Merit Board. Based on the arguments of the parties' attorneys, exhibits and testimony presented at trial, the administrative hearing officer finds that the City has failed to establish by a preponderance of the evidence that either Dick or Robert Taylor is guilty of misconduct which would justify their termination of employment and that they should be reinstated to full rank with back pay.

The City of Knoxville is divided into East, Central and West geographic sectors for police coverage and assignment. On all relevant dates, Robert Taylor and Toby Wells were patrol officers assigned to the West sector. Officers in the West sector were supervised by and reported directly to various sergeants including, Sergeants Tom Fox and Roger White who in turn reported to Lieutenants Sasscer and Roehl who reported to Captain Dan Davis. Sergeant Dick Taylor was a supervisor for the Central sector and his chain of command flowed to Lieutenants Woolridge, Goin and Catlett who reported to Captain Ed Cummings. All sector captains reported directly to Deputy Chief Coker who in turn reported to the Chief of Police, Phil Keith, as did Sergeant Gordon Catlett, Sr. who was in charge of Internal Affairs.

Shortly before noon on December 14, 1997 Officers Robert Taylor and Toby Wells proceeded to Cosby[1] Avenue located within the West sector to serve a domestic violence warrant on a Mr. Jack Longmire which had been taken out by his wife, Kelli Longmire. When confronted in the parking lot by these officers Longmire refused arrest struggling with both officers. In the course of the struggle, Longmire grabbed at the gun of Officer Taylor causing Officer Taylor to hit his emergency call button for assistance. After a vigorous physical struggle in which capstun was used to subdue Mr. Longmire, these officers ultimately succeeded in placing Mr. Longmire in handcuffs behind his back and seating him on the parking lot in the immediate vicinity of Kelli Longmire's and Officer

---

[1] It is unclear whether this should be "Cosby" or "Crosby" because we find it referenced both ways in the record.

Taylor's vehicles which were parked side by side. Subsequent thereto, Officer John Szczepanowski arrived on the scene at which time officer Taylor and Wells left Longmire in Officer Szczepanowski's custody and proceeded to Officer Wells['] police car which was parked a distance of some 40 to 60 feet away up the sloped parking lot. Officers Taylor and Wells went to the car for the express purpose of washing capstun overspray from Officer Taylor's eyes and hands which he had received in his struggle with Longmire and from which he was suffering the physically discomforting side effects typically associated with the same; namely, blurred, teary burning eyes and skin. While at Officer Wells['] car, both Officers Taylor and Wells heard a commotion in the vicinity of the prisoner and upon returning found Longmire lying face down with blood flowing from the right side of his head.

There is no dispute that Sergeant Taylor was the first supervisory officer on the site in response to Officer Taylor's emergency call, but within a matter of minutes of his arrival Sergeant Roger White also arrived on the scene. Although assigned to the Central sector. Sergeant Taylor responded to the emergency call because he was monitoring the police radio as a favor for Sergeant White who was the West sector supervisor on duty at the time of the arrest, but due to a conflicting church commitment had arranged for Sergeant Taylor to cover his calls during his absence. The timing sequence as to officers responding to the scene is evidenced by the 911 emergency call transcript for the afternoon of December 14. On this tape the various officers are identified by car number which represents a specific beat within the officer's assigned sector. At the time of Longmire's arrest, Officer Robert Taylor was assigned car #73; Officer Toby Wells car #81; Sergeant Roger White to car #80; Officer Szczepanowski car #71; and, Sergeant Dick Taylor car #40. From the transcript, Car 73 (R. Taylor) and Car 81 (T. Wells) are in route to Cosby at approximately 11:55. At 12:06 hours 40 seconds Car 73 (R. Taylor) is apologizing for having hit his emergency button to which dispatch responds at 12:07 hours 50 second that no apology is necessary and that the police wagon is in route to the scene. In the brief interim between these two calls, Sergeant White (Car 80) at 12:07 hours 30 seconds announces that he is back on the radio. At 12:08 hours 20 seconds Car 73 (R. Taylor) asks for a supervisor to which dispatch makes reference to Car 80 (Sergeant White) and in response Car 73 (R. Taylor) notes he believes Car 80 is out of service and references Car 40 (Sergeant Taylor). Sergeant White testified that from his location at church when he got back on the radio it would have taken him ten to fifteen minutes to arrive at Cosby which would have placed him at the scene at approximately 12:22. The only other officer responding to the emergency call at the scene was officer James Hellinger who from the 911 emergency transcript is apparently on the scene by 12:14 hours giving directions to the police wagon.

-4-

Sergeant Taylor upon arriving at the scene discovered Longmire's bloody face and was briefly advised by Officer Taylor that Longmire had resisted arrest struggling with the officers. Sergeant Taylor immediately proceeded to render medical aid to Longmire by cleaning and treating his head wound at the rear of the police wagon to which Longmire had been removed. In doing so, Sergeant Taylor instructed an off-duty officer, Ryan Flores, who apparently lived at the same apartment complex and who had appeared on the scene to wash Longmire's blood from the asphalt. Sergeant Taylor briefed Sergeant White upon his arrival on the scene and both Sergeants questioned Kelli Longmire who had been present and witnessed portions if not all of the arrest. Upon expressing concerns about the beating her husband had received she was specifically advised by both Sergeants about procedures for filing an abuse complaint with Internal Affairs as was her husband, Jack Longmire, when he was interviewed at the hospital by both Sergeants.

Prior to leaving the scene, Officer Robert Taylor confiscated various items from the Longmire's apartment, including a camera. telephone and guns for which he ultimately filled out a confiscation report. At the scene he filled out an arrest report and later that afternoon completed a resisting arrest warrant for Longmire after being treated at the hospital for a sprained wrist he had injured in his struggle with Longmire. The next day on December 15 Robert Taylor filled out a hand written Use of Force Report which he turned in late afternoon at the end of his shift to Sergeant White. On December 16, 1997 Robert Taylor prepared a typewritten Use of Force Report upon the instruction of Captain Dan Davis after being advised that his handwritten report was difficult to read. When the second type-written report was rejected due to spacing concerns, Officer Taylor prepared yet a third Use of Force Report by computer also on December 16. In all three Use of Force report Officer Taylor consistently notes that he can't advise about Longmire's head injury because when he and Officer Wells left Longmire in Szczepanowski's custody Longmire was not bleeding.

Upon review of Officer Taylor's Use of Force Report, Chief Keith instructed Sergeant Catlett of Internal Affairs to investigate the matter. On December 16th, Sergeant Rick Lyon of Internal Affairs contacted Jack Longmire by telephone who declined to give a statement whereupon the investigation was closed. Captain Dan Davis upon his review of Officer Taylor's Use of Force Report felt that there may be a problem with Officer Szczepanowski and on December 16 instructed Lieutenant Sasscer to investigate the report. Lieutenant Sasscer came in on the afternoon of December 17, 1997 to talk to Officer Szczepanowski, but at that point Szczepanowski was on medical leave due to injuries he sustained in connection with his arrest of teenager Michael Birt earlier than same day wherein he had broken the teen's leg Lieutenant Sasscer made no effort to follow through with any investigation until Officer Szczepanowski returned to work in early

-5-

January which by that time Lieutenant Sasscer understood Internal Affairs was investigating the matter.

Sergeant White upon his review of Officer Taylor's Use of Force Report also felt there might be a problem with Officer Szczepanowski and upon forwarding the Use of Force report to Internal Affairs attached to the report a handwritten note indicating that because of the statements in the Use of Force report he had left instructions for Officer Szczepanowski to complete a statement and turn it in ASAP. In concluding his note, Sergeant White noted that he had been filling in for a vacationing Sergeant Fox and that he himself would now be off until December 19. Internal Affairs did not re-open its investigation until after Sergeant Dick Taylor on January 8, 1998 expressed concerns regarding Officer John Szczepanowski to his supervisor, Lieutenant Gordon Catlett, Jr. who in turn reported the matter to his father, Sergeant Gordon Catlett, Sr. as head of Internal Affairs.

There is no dispute whatsoever that the original Internal Affairs inquiry (Case #97-2142) was initiated in response to Officer Robert Taylor's Use of Force Report and was subsequently reopened (Case #98-2147) in response to Sergeant Dick Taylor's complaints about Szczepanowski. However, after a series of interviews by Internal Affairs commencing on or about January 12, 1998 of the officers responding to the Longmire arrest scene, Sergeant Dick Taylor and Officer Robert Taylor were terminated by Chief Keith at the recommendation of Captain Dan Davis and Deputy Chief Robert Coker with the support of Sergeant Gordon Catlett based on the Internal Affairs investigative file.

The standard of review for the Chancery Court and this Court is governed by the Uniform Administrative Procedures Act which, under T.C.A. 4-5-322(h), provides the following:

(h) The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:

(1) In violation of constitutional or statutory provisions;
(2) In excess of the statutory authority of the agency;
(3) Made upon unlawful procedure;
(4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
(5) Unsupported by evidence which is both substantial and material in the light of the entire record.

-6-

In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

Although the Trial Judge did not articulate on what ground she found the judgment of the Administrative Hearing Officer was deficient, we conclude from a review of the record that it was in part the false statement Robert J. Taylor made under oath in a resisting arrest warrant for the suspect which stated the following:

> [O]n 12/14/97 at 1204 pm, the Defendant was in the parking lot of 4201 Crosby Rd. when officers approached him and advised him he had a warrant for his arrest. The Defendant stated the [sic] he was not going to jail and he began to fight officers vigorously. The Defendant began slinging his abody[sic] about and grabbed Officer Taylor['s] handgun while it was still in the holster. The Defendant was sprayed with Capstun to subdue his aggression but it failed. *The Def. slung officers onto a parked vehicle and the officers and Def. fell onto the pavement causing injury to Def's face & head and Officer Taylor's right hand.* (Emphasis added.)

The Hearing Officer obviously accepted Officer Taylor's explanation that his misstatement was inadvertent and caused by the stress of the situation, including having been sprayed with a stun gun. It is interesting to note in this connection that in a Use of Force Report made almost 30 hours after the incident, Officer Taylor again misstated the fact that he injured his right arm when he and Officer Wells were grappling with the suspect attempting to get him handcuffed.

While we concede that the misstatement on the resisting arrest warrant was perhaps not his final report on the incident and that the encounter was stressful to Officer Taylor, we cannot concede that either separately or combined would be sufficient for him to admit to causing injury to a prisoner in custody when in fact the injury occurred out of his presence, and most probably at the hands of another officer.

We accordingly conclude in light of these false statements that his defense is unsupported by substantial evidence and the Chancellor acted properly in imposing the penalty she did.

In reaching the foregoing determination we have not overlooked the proof in the record that Officer Taylor and the officer who most probably caused the injury to the suspect were not friends and that there was no reason for Officer Taylor to have made the statement to protect this officer. However that may be, the statement emphasized above was false and Officer Taylor's explanation is, in our view, incredible and does not meet the test of substantial evidence.

We also note, in addition to the foregoing, the record discloses another misstatement by Officer Taylor where, in an internal affairs interview on January 12, 1998, he stated the following:

Lyon:         Okay, backing up just a minute, Robert, I may have asked you but did, did you see Szczepanowski kick Longmire in the crotch?

Taylor:       No, sir, I didn't see that.  When he

Lyon:         Okay.

Taylor:       When he initially got there, when he pulled up and he started to exit his vehicle and he was getting out and I started walking up the hill toward the back of Toby Wells' car.  Now Toby was at the front end of my car still down there but, but I went up the hill toward the back of the car and I never saw him strike Longmire or anything.  I never saw him at, strike the guy at all.

However, on January 15, in another interview, he first repeated his denial as to the kicking, and then recanted:

Catlett:      And you never saw John, Officer Szczepanowski, or if I'm pronouncing his name right, kick this prisoner?

Taylor:       I never saw him beat this man or kick him or anything.

            . . . .

Catlett:      Robert, is there, is there anything else, I know you've had an opportunity to think about it since January the 12ᵗʰ, this being January the 15ᵗʰ, but have you thought of anything else that occurred down there or you might've seen and that you forgot to tell us about the incident?

Taylor:       Yes, sir.  I have.

Catlett:      Okay, and what is that, sir?

Taylor:       And, and I, and I've kinda been searching myself but initially when, when, when John had pulled up there at the scene I was standing back there at the back of the car there.  *I, I, I, I did, I did observe the same thing that Officer Wells did.*

Catlett:      And what's that?

Taylor:       *The, the kick.  The kick to the groin area.  And at that point I, I observed it.*  When, when I, when I turned around, when he got out

-8-

of the car, walked up there, and when I turned around I happened to, to look back, back across there and it, it appeared to be what I, what I appeared to be a, a kick and, and, and I went up there and to, to the back of the car there and, and we came up to, that's when Toby came up there and Toby had mentioned to me that, that he apparently had seen the same thing and that's when were [sic] heard this ruckus going on. We went down there. We noticed that the guy had, had these injuries there, but I had, as far as, as far as act, actually it, now that I get to looking at things, that, that's, that's that's what I, that's what it had to be. (Emphasis added.)

With regard to Sergeant Taylor, it appears the prime complaint against him was having blood from the victim washed away rather than preserved. The overwhelming proof is that there was no question the blood was that of Mr. Longmire and that there was no compelling reason that it be preserved. In this connection we concur in the finding of the Hearing Officer on this point wherein she said the following:

> The City speculates that Sergeant Taylor instructed Officer Flores to wash down blood to cover for his son, believing his son might have inflicted Longmire's head wound. No proof was presented which would support the City's position except once again for the testimony of Officer Wells who says Robert lied to his dad. Having previously addressed Officer Wells problematic testimony which the hearing officer finds unreliable, one is left only with Sergeant Taylor's plausible testimony on this point. Sergeant Taylor testified that he never believed his son had inflicted Longmire's head wounds, but that he was simply trying to diffuse a volatile situation. Other residents in the apartment were starting to come out into the parking lot following the struggle. The wet blood on the pavement constituted a potential hazard. The sight of his blood was contributing to Longmire's agitation and upsetting his wife who according to Sergeant Taylor has asked him to wash down the blood. Therefore, Sergeant White asked Officer Flores to wash it down believing it had no evidentiary value since it was undisputed that it was Longmire's blood and his wounds would be documented upon his treatment at the hospital. Further, Sergeant Taylor readily acknowledged that he instructed Flores not to discuss the matter. His instructions were not, however, directed as any part of a cover up or conspiracy, but were given to caution officer Flores from informally talking with the bystanders who were gathering at the scene.

We accordingly reverse the judgment of the Trial Court as to the penalty meted out to Sergeant Taylor and affirm the judgment of the Administrative Hearing Officer.

Before concluding, we do recognize that sometime after the incident Officer Taylor, as well as his father, were instrumental in seeing the investigation and ultimate punishment went forward

as to the officer who in fact had injured Mr. Longmire. While we commend both for this, we do not believe this fact should alter our determination as to the misstatements made by Officer Taylor.

For the foregoing reasons the judgment of the Trial Court is reversed in part and affirmed in part and the cause remanded for such further proceedings, if any, as may be necessary. Costs of appeal are adjudged one-half against Officer Taylor and one-half against the City of Knoxville.

_____
HOUSTON M. GODDARD, PRESIDING JUDGE